**TEXAS MEXICAN R. CO. v. BUNN.**

No. 12565.

Court of Civil Appeals of Texas.

San Antonio.

Dec. 9, 1953.

Rehearing Denied Feb. 10, 1954.

520

Carl Wright Johnson, Nat L. Hardy, San Antonio, Elmore H. Borchers, Laredo, for appellant.

Raymond, Algee, Alvarado, Kazan & Woods, Laredo, Lieck & Lieck, Robert R. Murray, San Antonio, for appellee.

NORVELL, Justice.

This is a railway crossing collision case. By its first point, the appellant railroad company asserts its principal contention that appellee was guilty of contributory negligence as a matter of law. As counter thereto, appellee says that his evidence supports the theory that the appellant's Diesel switch engine silently and without warning emerged from the darkness of the night into the street immediately in front of appellee's automobile, and thus negligently caused the collision and appellee's resultant damages. Other subsidiary points are

raised by the brief, and those calling for discussion will be treated hereinafter.

■ It is necessary to describe the crossing involved and its surrounding environs in some detail. In cases of conflict in the evidence, appellee's version is accepted, as the jury's findings were favorable to him and to the effect that appellee was free of contributory negligence, while appellant's agents and servants were guilty of negligence proximately causing the collision.

The collision between appellant's Diesel motor and appellee's automobile occurred shortly after midnight on the morning of December 17, 1951. Appellee was traveling in an easterly direction along Market Street in the City of Laredo. The Diesel was traveling in a northerly direction along the main track of the company which crosses the street at an angle of about fifteen degrees off the right angle, that is, the track veers to the west about fifteen degrees from a ninety degree crossing. The area surrounding the crossing is industrial in nature and a number of factories, warehouses and supply depots are situated nearby. There are five railroad tracks in the immediate vicinity and during the trial, by common consent, these were numbered 1 to 5, beginning with the most easterly track. The track where the collision occurred, sometimes called the main track, was given number 3. Tracks Nos. 1 and 2 (the most easterly tracks) run together at Market Street, and at that point are about 50 feet from the main track. To the south of the street and east of Track No. 1 is a large building occupied by the Laredo Boiler Works. This building is generally referred to in the record as Building No. 2, as it was so designated upon an exhibit used upon the trial. It is situated about 12 feet south of the south line of Market Street and 20 feet east of the most easterly railroad track in the vicinity (Track No. 1. There is no Track No. 2 south of Market Street.) and approximately 60 feet from the main track (No. 3). The building is about 65 feet in length from north to south. To the north of the street and east of Tracks Nos. 1 and 2 (here separated) is a large warehouse occupied by Gutierrez Wholesale Grocery Company, which is served by spur Track No. 1. Market Street at the point where it crosses the railroad tracks involved, is approximately 40 feet in width and has a black asphalt topping. At the time of the collision there was a street light containing a ninety watt globe on the north side of Market Street and about 50 feet west of the main track. Further to the east, along Market Street and past the most easterly track (No. 1), there was a string of street lights—one about every block—according to appellee's testimony. The main track, or Track No. 3, was protected by an automatic electric flasher signal, which is energized by an electric contact point along the track about 40 feet south of the south curb line of Market Street. Appellee testified that this flasher signal was not working on the night of the collision. He further testified that he heard no warning whistle, horn or bell, and that he did not see the engine prior to the collision. He testified that what he saw immediately before the impact was "just a flash. It was an object that came in front of me with a flash. * * * I did not know if it was an engine or train or a flying saucer."

While appellant's first point simply states that the undisputed material evidence shows that the accident in which plaintiff was injured was the result of his own negligence, the development of the argument suggests two theories of contributory negligence calling for discussion. The first is based upon an asserted violation of Article 6701d, § 86, Vernon's Ann.Tex.Stats. The second is the asserted failure of appellee to conform to the standard of conduct measured by the test of the reasonably prudent man.

In connection with appellant's first point, it is necessary to discuss certain contentions specifically raised by its third and fourth points, wherein it is asserted that the jury's findings against the appellant upon issues of primary negligence are without support in the evidence. Particularly is this true of the findings of failure to sound the horn or ring the bell upon the Diesel motor upon approaching the

crossing. It is likewise necessary to discuss the asserted error of the trial court in permitting the introduction of testimony relating to "other accidents, near-accidents, and incidents occurring at or near the crossing."

We first consider the effect of Article 6701d § 86, which is an imperative enactment of the Legislature enjoining the driver of a motor vehicle to do certain specified things when conditions render the statute applicable. Texas & New Orleans R. Co. v. Stewart, Tex.Civ.App., 248 S.W. 2d 177; Zamora v. Thompson, Tex.Civ. App., 250 S.W.2d 626. The command to the driver of the motor vehicle approaching a railroad grade crossing is to stop the vehicle within 50 feet, but not less than 15 feet, from the nearest rail of the railroad and not to proceed until he can do so safely.

This command is operative whenever (to quote the statute)

"(a) A clearly visible electric or mechanical signal device gives warning of the immediate approach of a train;

"(b) A crossing gate is lowered, or when a human flagman gives or continues to give a signal of the approach or passage of a train;

"(c) A railroad engine approaching within approximately fifteen hundred (1500) feet of the highway crossing emits a signal audible from such distance and such engine by reason of its speed or nearness to such crossing is an immediate hazard;

"(d) An approaching train is plainly visible and is in hazardous proximity to such crossing."

█ As to subdivision (a), appellee testified that the electric signalling device was not operating at the time he approached the crossing. In this he was corroborated by witnesses who appeared on the scene shortly after the collision, when the Diesel motor was in a position upon the rails which would have caused the device to operate had it been in working order. This evidence was contradicted, but the jury's finding that the device was not working is binding upon this Court.

Subdivision (b) of the article is not applicable to the facts of this case.

█ Subdivision (c) becomes operative upon the emission of an audible warning signal. Upon this point, we are again confronted with a conflict in testimony. The jury found that the operator of appellant's Diesel motor failed to operate the whistle or horn prior to entering Market Street; that this was negligence and a proximate cause of appellee's injuries. Appellee testified that as he approached the crossing he did not hear either a warning whistle or horn, nor did he hear the ringing of a bell. He testified, perhaps by way of conclusion, that, although it was a cold night and he had the windows of his automobile rolled up, he would have heard the warning had a horn been blown or a bell rung. He also testified to facts and circumstances which would tend to support that conclusion, such as his approximate distance from the crossing at a time when the Diesel motor necessarily must have been in close proximity thereto; the fact that his hearing was good and that upon previous occasions he had heard an engine's warning when his automobile windows were closed. The members of the train crew testified affirmatively that the horn on the motor was sounded and that the bell was rung, and appellant contends that appellee's testimony upon the point must be rejected as insufficient to raise a jury issue in that it was negative in nature. Appellant relies upon the case of Texas & N. O. R. Co. v. Brannen, 140 Tex. 52, 166 S.W.2d 112, wherein it was held that the negative testimony of the occupant of a closed automobile which had a windshield wiper operating, that she could not tell whether the bell of the engine was sounding or not, was insufficient to raise issue of failure to ring the bell. The Supreme Court held that in order to raise this issue, it was not only necessary to show that the bell or other warning device was not heard by the witness, but also that the witness was in a position to have

heard the same if the same were sounded. From appellee's testimony, independent of any conclusion he may have expressed, the jury could reasonably conclude that Bunn was in a position to have heard a warning device had one been sounded. Texas & New Orleans R. Co. v. Krasoff, 144 Tex. 436, 191 S.W.2d 1. We conclude, therefore, that subdivision (c) of Article 6701d was not applicable to the case under the jury's findings.

■ The question of the applicability of subdivision (d) of the article, as well as the assertion that appellee failed to comply with the standard of care required by the common law may be considered together, bearing in mind, however, that the statute uses the words "plainly visible," and it is possible that a train may not be "plainly visible" and yet a motorist may be guilty of contributory negligence barring a recovery if he fails to use reasonable diligence in discovering the presence of the train.

It is appellant's contention that it appears conclusively that the train (in this case a Diesel motor switch engine) was "plainly visible," and that as a matter of law appellee failed to use ordinary care in failing to stop, and in attempting to negotiate the crossing under such circumstances.

Appellee testified that he was thoroughly familiar with the crossing; that the main track was protected by an automatic flasher light; that he was cognizant of this fact and had never known of an instance when the signal had failed to work when a train or engine approached or was upon the crossing; that he noticed the flasher light was not working; that he could see the street lights situated along Market Street to the east and across the tracks; that he heard no warning emitted by an engine whistle, horn or bell, and accordingly supposed the street to be clear when he approached and attempted to cross the track.

The Diesel motor was traveling very slowly—about four to five miles per hour. Bunn testified that he was driving between 25 and 30 miles per hour, and that his car was five to six feet to the right of the center line of the road. The point of impact was from 10 to 15 feet north of the south boundary line of Market Street. The flasher light of the main track was immediately west of the track and situated about three feet to the south of the Market Street south boundary line or curb.

■ Appellant attacks the testimony of appellee in two ways. By deposition, appellee testified that he did not look to the right as he approached the crossing and had he done so, he could probably have seen the Diesel motor. This statement was, however, qualified upon the trial and it rather definitely appears that the engine was within his normal range of vision for some distance back, as he approached the track. Appellee's statement as to his not looking to the right was not such an unequivocal admission as would convict him of contributory negligence as a matter of law, particularly in view of its later qualifications and explanations. United States Fidelity & Guaranty Co. v. Carr, Tex.Civ. App., 242 S.W.2d 224, wr. ref.

A more serious matter is presented by the contention that appellee having seen the flasher light signal stand must necessarily have seen the Diesel motor. It is argued that the Diesel must have been directly behind the flasher signal box at a time within which appellee could have stopped without striking the engine. It is stated in appellant's brief that:

"It would have been a physical impossibility for the plaintiff to have seen the signal box and observed that the flasher lights were not working and not have seen the locomotive, as the headlights on the plaintiff's car would have been shining to some extent upon the engine and the diagonal orange stripes on the front and left hand side of the locomotive, and would have been clearly visible. The engine was certainly within line of his vision even if he had not turned his head directly to the right to look in that direction.

"He said he continued to look at the flasher light installation right up to the time of the collision. His testifying

that he could see the signal stand and not the engine would be just the same as saying he could see a picture on a wall and not see the wall."

■ The mere statement of appellee that he did not see the Diesel motor is not sufficient in itself to present a case for jury determination. In Creal v. United States, D.C., 84 F.Supp. 249, 252, it was said that, "One may not claim the right to recover, because he has looked and did not see, if the conditions are such that had he looked he must have seen." See also Lackey v. Gulf Coast & Sante Fe R. Co., Tex.Civ.App., 225 S.W.2d 630; Blasdell v. Port Terminal Railroad Ass'n., Tex.Civ. App., 227 S.W.2d 248; Zamora v. Thompson, Tex.Civ.App., 250 S.W.2d 626. Perhaps another way of stating the contention is to say that Bunn's testimony that he did not see the train is so inherently improbable under the facts of this case as to be wholly insufficient to save him from the charge of contributory negligence.

In order to escape this threatened bar, appellee has resorted to a mass of detailed evidence which we will summarize as briefly as possible. We again state the evidence in the light most favorable to the verdict.

An employee of the United States Weather Bureau at Laredo testified that the records in his office indicate that during the night of December 16th and morning of December 17th, the sky was solidly overcast, that is, completely covered with clouds with a ceiling of about 900 feet; that the cloud condition was such that the moon and the stars did not shine through the overcast. It appears that the air was clear of smoke or fog (visibility of 15 miles) and that immediately prior to the collision the Diesel motor was moving from the round house south of Market Street toward and onto the street. Appellee in some detail described the area immediately south of Market Street and east of the main track. This description was given as to the morning of the collision and from observations made on subsequent occasions. Building No. 2, heretofore described, was located in this area. Bunn testified that there was no light in this section; that in looking into this area from an automobile, and presumedly outside of the beams of the headlights, "you had to adjust your eyes and there is just a dim—that dirt blends into it and you can hardly see the outline of the (railway) cars." Bunn testified that a luminous paint was used on the signal stand supporting the flasher signals. (This stand was surmounted by a cross-arm railroad warning sign.) He steadfastly maintained that while "he saw the luminous paint on the sign, he did not see the engine."

Other witnesses testified as to the darkness of the area south and east of the intersection of Market Street and the main railroad track. Numerous photographs were introduced in evidence, which disclose the relative positions of tracks, signal stations and background buildings in the area. This evidence tends to support appellee's version that it was difficult to see a dark Diesel motor in this area in the nighttime when the sky was overcast.

In addition to this evidence, appellee also produced witnesses who testified from their personal experience that it was extremely difficult to see these Diesel motors in the nighttime; that at times they had noticed that the flasher lights were not working and had failed to see a switch engine until but a short distance away; that they had not seen either the beam of the engine's headlight or the outline of the motor itself. From photographs appearing in the statement of facts it appears that the headlight was recessed into the front of the motor. A 250-watt globe was evidently used, but this was of a stationary rather than a revolving type used upon some Diesel motors.

The testimony of these witnesses referred to, tended to establish the following: (a) that upon occasions, near the time of the collision here involved, the flasher lights at the crossing had not been in operation when a train or engine was in position to have caused them to operate had they been in working order, (b) that the area of the crossing and its surroundings made

it difficult to see a black or darkly painted motor engine in the nighttime, and (c) that despite the fact that the Diesel motor was equipped with a headlight, witnesses had been unable to see them until they had almost made contact with them. (Upon cross-examination, in at least two instances, it was made to appear that the failure to observe the engine was probably due to the carelessness of the witness. This was not true in all instances, however, and an analysis of each witness' testimony is not deemed necessary to a disposition of this case.)

■■ The appellant earnestly contends that the testimony of these witnesses was improperly received. Such testimony is referred to as an attempt to prove other accidents, near accidents and incidents occurring at or near the crossing involved. We recognize that a bald summarizing statement that a number of people have been killed at a crossing should not be received over objection, Gillham v. St. Louis, Southwestern Ry. Co. of Texas, Tex.Civ. App., 241 S.W. 512, but, as we understand the rule recognized by the authorities, the testimony of others as to their experiences or difficulties at a particular crossing is admissible in a case, such as this one, wherein it is asserted that one who used the crossing and was injured thereon should have known of the presence of an approaching train. In the recent case of Karr v. Panhandle & Santa Fe Ry. Co., 262 S.W.2d 925, 932, the Supreme Court, in affirming a judgment of the Court of Civil Appeals holding a motorist guilty of negligence, as a matter of law, in attempting to negotiate a railway crossing specifically pointed out that, "It is noteworthy that there was no testimony whatever that anybody had suffered any accident or near-accident at the crossing under similar conditions prior to the night in question, as there was in the Long case, supra." Missouri Kansas & Texas Ry. Co. v. Long, Tex.Civ.App., 23 S.W.2d 401, wr. ref. See, also, Beaumont, Sour Lake & Western R. Co. v. Richmond, Tex.Civ.App., 78 S.W. 2d 232; Ft. Worth & Denver City Ry. Co. v. Looney, 241 S.W.2d 322.

■ Under the evidence in this case, it cannot be said as a matter of law that the Diesel motor upon the night in question was "plainly visible." Not only did appellee testify that he did not see it, because of the darkness of the night and the lack of light in the area from which the engine emerged, but others corroborated him to some extent by their testimony as to the difficulty of seeing appellant's Diesel motors at this crossing in the nighttime. We hold, therefore, that subdivision (d) of Article 6701d, § 86, is not applicable to the case (in view of the jury's findings), and that appellee was not shown to be guilty of negligence per se in failing to stop within 50 feet and not less than 15 feet from the nearest rail of the railroad.

But, as above indicated, this holding does not fully dispose of the contention that appellee was guilty of negligence as a matter of law. A railroad crossing is a place of potential danger, and any person approaching the same is charged with the duty of using due care to ascertain whether or not there is a train upon or approaching the crossing. This obligation is operative although the train may not be "plainly visible" within the meaning of the statute. In fact there were numerous cases decided in Texas prior to the adoption of Article 6701d, § 86, in 1949, holding that one running into a train upon a crossing, under certain circumstances, would be barred from recovery. Such cases are represented by Texas, Mexican Ry. Co. v. Hoy, Tex. Com.App., 24 S.W.2d 18, and Texas & New Orleans R. Co. v. Stratton, Tex.Civ.App., 74 S.W.2d 741.

■ The remaining question presented under appellant's first point may be stated as follows: Can it be said as a matter of law from the evidence in this case, that the appellee should have, by the exercise of reasonable diligence, discovered the presence of the Diesel motor on or approaching the crossing in time to have stopped his automobile and avoided the collision? Even the actual presence of a train upon the crossing does not bar a recovery by a motorist (or his legal representatives) if

there exists some physical circumstance which would reasonably lead the motorist to believe the road or way was clear. This is illustrated by the case of St. Louis, Brownsville & Mexico Ry. Co. v. Brack, Tex.Civ.App., 102 S.W.2d 261, in which it was held that a recovery against a railway company on behalf of a deceased motorist's representatives was not barred, even though it appeared that he had run into a train then occupying a crossing. This, because a jury could reasonably conclude that Brack, the deceased motorist, believed that the way over the crossing was open because of the presence of a low dark tank car upon the crossing with higher and more easily seen box cars on either side. See, also, cases cited and discussed in Karr v. Panhandle & Santa Fe Ry. Co., Tex.Sup., 262 S.W.2d 925.

In the present case, the jury found, and the finding is supported by sufficient evidence, that the flasher lights at the main track were not operating immediately prior to the collision. Appellee testified that as these lights were not working and he could see the street lights along Market Street extending in an easterly direction, he concluded that the way was open. Of course, the failure of the flasher lights to operate did not excuse appellee from using due care in negotiating the crossing. It was, however, a factual circumstance of importance to be considered in determining whether or not his conduct fell below that which a reasonably prudent man would exercise under the same or similar circumstances. "Human conduct must be judged by human standards", Surdyk v. Indiana Harbor Belt R. Co., 7 Cir., 148 F.2d 795, 797, and it has been held that the quiescence of a signal usually operative upon the approach of a train is in a sense an invitation to a motorist to use the crossing. Baltimore & Ohio R. Co. v. Corbin, 73 App.D.C. 124, 118 F.2d 9. Appellee's brief contains numerous citations supporting this rule. In Pennsylvania R. Co. v. Shindledecker, 6 Cir., 44 F.2d 162, 163, it was said:

"If a driver at a particular crossing has been repeatedly stopped or warned by an automatic bell, or flashing light, or swinging signal, or other means familiar to him by which a coming train gives notice of its close approach, and if, on a particular occasion, he is paying sufficient attention to realize that this customary notice is not being given, it is, we think, an entirely permissible inference, even in the lack of any direct proof, that the absence of the usual warning has a substantial effect in leading him to go ahead, and in neutralizing that incessant watchfulness which self-protection would otherwise demand."

See, also, Teague v. St. Louis Southwestern Railway, 5. Cir., 36 F.2d 217; Moore v. Chicago, B. & Q. R. Co., D.C., 28 F.Supp. 804; Spreitler v. Louisville & N. R. Co., D.C., 36 F.Supp. 117; Mallett v. Southern Pacific Co., 20 Cal.App.2d 500, 68 P.2d 281; Peri v. Los Angeles Junction Railroad, Cal.Sup., 137 P.2d 441; Chicago & Alton R. Co. v. Blaul, 175 Ill. 183, 51 N.E. 895; Humbert v. Lowden, 385 Ill. 437, 53 N.E.2d 418; Langston v. Chicago & N. W. Ry. Co., 398 Ill. 248, 75 N.E.2d 363; Greenfield v. Terminal R. Ass'n, 289 Ill.App. 147, 6 N.E.2d 888; Niemi v. Sprague, 288 Ill. App. 372, 8 N.E.2d 707; Cleveland, C. etc. Ry. Co. v. Heine, 28 Ind.App. 163, 62 N.E. 455; Louisville & N. R. Co. v. Revlett, 224 Ind. 313, 65 N.E.2d 731; Munkel v. Chicago, M., St. P. & P. Ry. Co., 202 Minn. 264, 278 N.W. 41; Sisk v. Chicago, B. & Q. R. Co., Mo.App., 67 S.W.2d 830; Keller v. Southern Ry. Co., 205 N.C. 269, 171 S.E. 73.

We accordingly conclude that appellant's point asserting that appellee was guilty of negligence as a matter of law is not well taken and it accordingly is overruled.

We also overrule appellant's third point, which asserts that there is no evidence supporting the jury's findings of negligence on the part of appellant's employees. In our opinion, the evidence is sufficient to support the findings that the operators of the Diesel motor failed to give

warning of its approach to the crossing by sounding the horn or ringing the bell. We are further of the opinion that the evidence supports the finding that flasher lights were not operating at the time of the collision, and that in view of this circumstance the failure of the engine crew to stop the engine was negligence, as was the failure of the company to keep the lights in a state of good repair. There was testimony that when the flasher lights were operating there was a small light on the side of the signal which cast a beam down the track toward the on-coming engine and that when this indicator light was not burning, it was the custom, as well as the duty, of the train crew to stop the train and send out a flagman to the crossing. A number of witnesses testified that within a few days of the collision they had observed that the flasher lights were not working, although railway motors, engines and trains were in positions which would have energized the signal lights had they been in working order. From the record it may reasonably be inferred that something more than a momentary failure of the signal is involved. Evidence of uncertain operation of a signal within a reasonable space of time with reference to the collision may be considered by a jury in connection with other circumstances in deciding the question of the railway company's asserted failure to maintain the signal in good operating condition. Vaca v. Southern Pac. Co., 91 Cal. App. 470, 267 P. 346. In our opinion, the evidence in this case is sufficient to meet the rule stated in Louisville & Nashville R. Co. v. Mahoney, 220 Ky. 30, 294 S.W. 777. Five witnesses testified that they had observed failures of the flasher lights, from periods of time ranging from fifteen minutes, the day before, and a week or two weeks, before the collision.

A discussion of further grounds of primary negligence relied upon by the appellee is not necessary to a disposition of this case. We hold that the evidence was legally and factually sufficient to support the findings above discussed, and having held that appellee was not guilty of negligence as a matter of law, it is unnecessary for us to consider appellee's theory of recovery based upon the doctrine of discovered peril.

In our opinion, no reversible error is presented by the points complaining of the method employed by the trial court in submitting the case to the jury. By this we do not mean that the charge was free of error, as an abstract proposition, but that such errors, if any, as may be present therein, are not of such nature as to require another trial.

The record discloses several colloquies between counsel for appellant and the trial judge, and it is here contended that in such conversations the trial judge made remarks which amounted to comments upon the evidence, and which were prejudicial to appellant. The cold written record does not bear out the claims of prejudice. A trial judge is necessarily allowed some discretion in expressing himself while controlling the trial of a case, and a reversal of a judgment should not be ordered unless a showing of impropriety, coupled with probable prejudice, is made.

We are further of the opinion that no reversible error is disclosed by appellant's point complaining of the reference to appellee's asserted "change of personality" made during argument of counsel. There was some medical testimony from which a probable change in personality could be inferred. Further, it appears that this argument was made by the first of appellee's attorneys to address the jury, and no objection was made thereto. Under these circumstances, the second reference by another of appellee's counsel could not in itself result in a reversal of the judgment.

Finally, appellant asserts that "the amounts of damages assessed by the jury are so excessive as to show passion and prejudice, and that an injustice has been done to defendant (appellant)." No authorities are cited in support of the point and appellant's presentation of the matter is extremely brief. Appellant states that it does not contend that appellee's injuries were

not serious or that he did not suffer permanent disability as a result thereof, and no basis for the claim of passion or prejudice on the part of the jury, other than the size of the verdict, is suggested. It seems that the claim of excessiveness is based upon the fact that at the time of his injury appellee was drawing compensation from the United States Government for a thirty per cent disability for injuries received while a member of the armed forces; that he remained in the hospital only two weeks and was getting around on crutches in about two months and that (as appellant asserts) he was able to follow a gainful occupation after the accident.

The jury, in answer to one question, found that appellee had suffered damages in the sum of $82,200. Of this amount, $2,319.45 was represented by hospital and nursing expenses and doctors' bills, concerning which there is little or no dispute, leaving approximately $80,000 representing physical and mental pain and suffering experienced by appellee up to the time of the trial; pain and suffering that would probably be undergone in the future; loss of earnings up to the time of trial, and impairment of earning capacity in the future. The jury was specially instructed that appellee could not recover for past disabilities or ailments, but could recover for any aggravation of such injuries.

Beyond doubt, appellee was severely and permanently injured. He suffered a brain concussion which almost resulted in death and rendered him unconscious for days. He testified that he was unable to orientate himself until ten days after the collision. Appellee was naturally right-handed, and his right shoulder was crushed and the bones thereof had to be fastened together with metal pins and wires. The upper arm was rendered practically motionless, and the movement of the lower arm was thus largely restricted to the elbow. The left leg was fractured in four places, so that a steel pin or rod had to be inserted in the hollow parts of the femur and the same placed in a cast in order to hold it together. According to the medical testimony, there is a probability that this rod will eventually have to be removed. The legs are no longer of equal length and it is necessary for appellee to use a crutch or crutches.

Appellee further testified that he had undergone and was still experiencing severe throbbing headaches, presumedly as a result of the brain concussion he had sustained; that he had a continuous pain in his leg, back and particularly in the upper part of the shoulder, and that when he turns suddenly the pain in the shoulder is so severe that he becomes nauseated. He further testified as to extreme nervousness, difficulty in sleeping and the necessity for using sedatives in order to obtain relaxation of any kind. Appellee's wife corroborated his testimony as to nervousness and difficulty in resting.

From the very nature and severity of appellee's injuries, the jury would be justified in finding a substantial decrease in earning capacity. The evidence indicates that appellee is capable of doing certain types of work despite his injuries. It appears that he was able to secure temporary employment with a government service or authority which was about to cease functioning, namely, the Rent Stabilization Office. While appellee was being compensated at the salary rate of $5,000 per year, he testified that he had received notice of discontinuance of his employment as of October 10, 1952, but that the time of employment had been subsequently extended to March or April of 1953. (This case was tried in September of 1952.)

There is evidence in the record from which the jury could conclude that appellee prior to the accident was capable of earning a relatively high annual income. Shortly after being discharged from the armed forces he entered the real estate business with his father and was paid 25% of the commission which he earned. He introduced income tax returns for the years 1949, 1950 and 1951 (the year he was injured). These showed an income of $3,180.-66 for 1949, $3,731.75 for 1950, and $7,-

384.02 for the year 1951. The increase in income for the year 1951 is partially explained by the fact that during this year appellee began operating independently as a real estate dealer. The evidence forms the basis for an inference of a rather rapidly developing earning capacity in a young man. He was twenty-nine years of age when injured and had a life expectancy of approximately thirty-eight years.

In view of appellee's past financial history, the incapacitating nature of his injuries and his long life expectancy, we are unable to say that the jury's award is so excessive as to warrant this Court's intervention in a matter primarily entrusted to a jury's discretion. Sharpe v. Munoz, Tex. Civ.App., 256 S.W.2d 890, and authorities there cited; 25 C.J.S., Damages, § 87, p. 619; 15 Am.Jur. 479, 501, Damages, §§ 71, 72 and 91; Annotations, 12 A.L.R.2d 611.

In our opinion appellant's brief does not point out a reversible error and the judgment appealed from is accordingly affirmed.

### On Motion for Rehearing.

In its motion for rehearing appellant strongly urges that we erred in failing to hold that appellee was guilty of contributory negligence as a matter of law. It is said that as Bunn approached the railroad crossing there was undoubtedly a time when he could have stopped his car which coincided with the time the Diesel motor was behind the signal stand which appellee says that he saw. Appellant asserts that under these conditions Bunn's statement that he did not see the Diesel motor is without probative value.

It is conceded that the act of "seeing" involves a psychological, as well as a physical process. We are concerned with perception, a process which encompasses not only the camera-like mechanical action of the lenses and retinae of the eyes but the transmission of stimuli to the optical centers in the brain.

In the trial court it was suggested by appellant's counsel in his jury argument, that it was a manifest absurdity, from the standpoint of a normal individual, to say that a person had looked and seen only halfway across a room, where there was no obstruction preventing his seeing the wall directly opposite him, as range of vision and perception do not stop in mid-space or thin air. The illustration given is extreme, and by contrast it may be pointed out that one may, by use of a camera, take a picture of a distant hill and, upon scrutiny of the developed photograph, discover an animal which he had not perceived at the time the picture was taken. In this instance it could not be seriously argued that the person taking the photograph must necessarily have seen or perceived the animal on the hill. Mental characteristics and attitudes, such as training and attention, are involved. The problem here presented—of the Diesel motor behind the sign, with its proper classification as a question of law or a question of fact—lies somewhere between the two extreme examples given, and this is generally true of most "perception" problems involved in negligence cases.

When and under what circumstances are trial and appellate courts authorized to consider the issue as one of law? The particular facts and surroundings of each case must be considered. For this reason our original opinion sets out the occurrences and circumstances of this case in some detail. The various factual elements therein stated are not of equal importance. Some may be comparatively remote, but they all have their part in presenting a true picture of the situation relating to and surrounding the collision. As stated in the original opinion, testimony relating to the experiences of others at the particular crossing involved has been recognized as relevant evidence in cases of this kind. Perhaps the most important single factual circumstance lies in the failure of the flasher signal, a controverted issue decided by the jury against the appellant. The effect of such failure in connection with the classification of the approaching motorist's "perception" as either standard or substandard is fully discussed by the authorities cited in the original opinion.

We have carefully considered appellant's motion for rehearing, but adhere to our original holding that the question of appellee's contributory negligence was for the jury, and that its finding upon the issue is not against the overwhelming preponderance of the evidence. The motion is accordingly overruled.